UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAMUEL CANNON,                                  Case No. 09-14058

                    Plaintiff,                  Denise Page Hood
v.                                              United States District Judge

FRANK BERNSTEIN, *et al*,                       Michael Hluchaniuk
                                                United States Magistrate Judge

                    Defendants.
_____/

**REPORT AND RECOMMENDATION**
**MOTION FOR SUMMARY JUDGMENT (Dkt. 85)**

## I.    PROCEDURAL HISTORY AND FACTUAL BACKGROUND

This matter is before the Court on defendants' second motion for summary

judgment. (Dkt. 85). Defendants contend they are entitled to summary judgment

based on collateral estoppel and qualified immunity. Plaintiff, who is represented

by counsel, filed a response on March 4, 2015. (Dkt. 88). Defendants filed their

reply on March 18, 2015. (Dkt. 89). On April 23, 2015, the parties filed their

joint statement of resolved and unresolved issues. (Dkt. 90). Pursuant to notice,

the court held a hearing on April 30, 2015. (Dkt. 86). At the hearing, the court

permitted the parties to file supplemental briefs on two issues. Defendants wished

to supplement the record regarding whether certain log evidence was withheld or

improperly destroyed and plaintiff wished to supplement the record regarding the

particular conditions of his confinement in administrative segregation.  The parties

filed their initial supplemental briefs on May 7, 2015 (Dkt. 91, 92) and filed their

responses on May 12-13, 2015.  (Dkt. 93-94).

By way of further procedural background, on April 1, 2013, the undersigned

issued a report and recommendation on the first motion for summary judgment.

(Dkt. 62).  District Judge Denise Page Hood, who had referred this matter for all

pretrial proceedings, adopted the report and recommendation, which

recommended granting in part and denying in part the motion for summary

judgment.  (Dkt. 67).  Specifically, the undersigned recommended denying

summary judgment on the substantive due process claim and the qualified

immunity defense, and granting summary judgment on the Eleventh Amendment

immunity and judicial immunity defenses.  As noted by Judge Hood, the crux of

plaintiff's complaint is not that there is no evidence to support his major

misconduct conviction, but that defendants falsified evidence and failed to present

exculpatory evidence.

Defendants moved for reconsideration of Judge Hood's decision (Dkt. 71),

based on the case of *Peterson v. Johnson*, 714 F.3d 905, 917 (6th Cir. 2013),

which was issued on June 20, 2013, after the report and recommendation.  On

March 31, 2014, Judge Hood denied the motion for reconsideration as follows:

Here, the Court is unpersuaded that on the facts of

2

this case, the *Peterson* decision requires summary judgment relief be granted to Defendants. The Court is satisfied, as Defendants have argued, that Plaintiff had a hearing before a hearings officer. As exhibited in the Order Affirming Agency Decision [Docket No. 60, Ex. 1], Judge Giddings of the Thirtieth Judicial Circuit Court For Ingham County did affirm the hearing officer's decision. However, Judge Giddings stated that "[t]he agency's finding of major misconduct is supported by competent, material and substantial evidence on the whole record." [Docket No. 13, Pg ID 51]

Plaintiff's Complaint before this Court alleged that the disciplinary report prepared by Defendant Frank Bernstein falsely alleged that evidence linked Plaintiff to the attempt to escape. More importantly, Plaintiff also alleged that Defendants submitted additional false reports, hid exculpatory evidence, and intimidated witnesses into not making statements. Plaintiff contended that as a result of the disciplinary report, he was kept in disciplinary confinement pending the outcome of a hearing. As Defendants argue, the hearings officer determined that Plaintiff was guilty of having committed major misconduct and that determination was affirmed by the Circuit Judge. However, Defendants do not allege that the hearings officer or the Circuit Court Judge made a determination whether Defendants in fact submitted false reports, hid exculpatory evidence, or intimidated witnesses. If this was in fact the case, the record before both the hearings officer and subsequently before the Circuit Judge was incomplete; the same constitutional violation Plaintiff claims in this case. The findings of fact made by the hearings officer, that Plaintiff committed major misconduct by essentially attempting to escape the prison, says nothing about Plaintiff's claim that there was evidence that, if placed before the hearings officer, could have changed his determination.

> As stated in the report and recommendation, it is well-established that offering false evidence or perjured testimony in a misconduct hearing against a prisoner can sustain a substantive due process claim. *See e.g. Chancellor v. City of Detroit*, 454 F. Supp. 2d 645, 659 (E.D. Mich. 2006) (noting that the Supreme Court held in *Pyle v. Kansas*, 317 U.S. 213, 216 (1942), that "'perjured testimony knowingly used by the state authorities to sustain [defendant's] conviction' and 'deliberate suppression by these same authorities of evidence favorable to him' violates the Constitution."). The Court has noted that Plaintiff does not dispute that defendants found some evidence that someone tried to escape but that it was not he who tried to escape. The determination of the hearings officer, affirmed by the Circuit Court, was that it was in fact Plaintiff who tried to escape. However, Plaintiff's second contention, "that defendants, in their zeal to find the culprit and avoid appearing incompetent, picked him as a convenient target, filled in the gaps with fabricated evidence, and concealed evidence that would exonerate plaintiff," was not addressed. The Court still determines this question to be one of fact that was not yet addressed and not disposed of simply by finding that Plaintiff attempted to escape.
>
> * * *
>
> Whether Defendants submitted false reports, hid exculpatory evidence, and intimidated witnesses into not making statements is a genuine dispute concerning material facts that go to the heart of Plaintiff's constitutional claim.

(Dkt. 75, Pg ID 816-817).

This matter is now ready for report and recommendation. For the reasons set forth below, the undersigned **RECOMMENDS** that defendants' motion for summary judgment be **DENIED**.

## II.    PARTIES' ARGUMENTS

### A.    Defendants' Arguments

Defendants contend that they should receive summary judgment under

*Peterson* because what is ultimately at issue in the instant case – whether

Defendants falsified documents, failed to obtain relevant information from

relevant witnesses, intimidated witnesses, and concealed exculpatory evidence, in

violation of Plaintiff's right to substantive due process – has already been

appealed to the state Circuit Court. Ingham Circuit Court Judge James Giddings,

who has carefully reviewed the hearing record, including Plaintiff's arguments

that Defendants falsified documents, failed to call relevant witnesses, failed to

present appropriate questions to those witnesses, and committed fraud in order to

convict him of attempted escape, found that the evidence in the record, including

the video "amply supports" the findings by the hearing officer. Petitioner has

presented no sound basis for overturning the agency's decision." (Dkt. 85, Exs. D,

E).

Defendants in this case submit that as in *Peterson*, a reasonable jury would

not find in plaintiff's favor based on the factual findings already made by the

Hearing Officer in this case.  As noted in the Hearing Report, (Dkt. 85, Ex. C, pg.

1), the Hearing Officer considered plaintiff's arguments that documents were

forged by defendants and deemed that the fact that a date was changed on his

misconduct ticket, while in error, had no bearing on the merits of whether plaintiff was guilty of the charge, and was reasonable in light of the days taken to investigate the matter and plaintiff's transfer between facilities. Defendants also point out that the Hearing Officer, and not any other defendant, determined that the additional statements and questions requested to be answered by plaintiff were also not relevant to whether plaintiff should be found guilty of the attempted escape.

The hearing officer ultimately found plaintiff guilty of the attempted escape charge. Plaintiff appealed his conviction to the MDOC Central office.  Again, Plaintiff argued that his due process rights were violated because staff falsified documents to find plaintiff guilty of the misconduct, and that the ticket was not timely reviewed.  Plaintiff also claimed that the hearing investigator did not thoroughly conduct his duties in obtaining questionnaires from all relevant witnesses and that dates on the misconduct documents had been falsified. Plaintiff's request for a rehearing was denied by Richard Stapleton, the MDOC hearings administrator during that time period. (Dkt. 85, Ex. C, pp. 3-11).

According to defendants, plaintiff in the case at hand, unlike the *Peterson* plaintiff, who did not take the additional step, then filed an administrative appeal of the MDOC's decision to uphold the ticket with the Ingham County Circuit Court.  In his appeal petition, as plaintiff argued before the hearing officer and in

6

support of his rehearing request, plaintiff argued just like he had done at the initial

hearing, that defendants falsified the date on the misconduct ticket to find him

guilty of the charges, plaintiff also argued that he was denied the opportunity to

have Corrections Officer Peggy Winters and food service worker Constance

Wambold listed as witnesses, and plaintiff argued that the hearing officer lied in

his report that plaintiff was seen exiting window in food service.  (Dkt. 85, Ex. D,

Petition for Judicial Review).  The circuit judge reviewed the agency record (Dkt.

85, Ex. C) and the confidential video footage obtained in this case which has been

previously submitted as an exhibit in this case.  (Dkt. 50, "Defendants' Motion for

Summary Judgment, Ex. A (video evidence previously submitted under seal)).

After reviewing the record, including the evidence that the hearing officer

considered in rendering the decision to uphold the misconduct, the circuit judge

issued an opinion stating that after carefully reviewing all of the evidence

presented that "[t]he agency's findings of major misconduct is supported by

competent, material, and substantial evidence on the whole record."  The circuit

judge added that "[s]uffice it to say, that the video amply supports the findings by

the hearing officer. Petitioner has presented no sound basis for overturning the

agency's decision." (Dkt. 85, Ex. E, "Circuit Court Order Affirming Agency

Decision").  Defendants also contend that both witnesses Wambold and Winters

testified to the effect that they had seen plaintiff on video and believed he was

7

attempting to escape the facility.  (Dkt. 85, Exs. H, J).

Defendants acknowledge the post-*Peterson* case of *Roberson v. Torres*, which arguably limits the applicability of *Peterson*. In *Torres*, the defendant correctional officer sprayed the prisoner-plaintiff with a chemical agent to gain his compliance with an order to go to the back of his cell to prepare to be placed in restraints.  *Roberson v. Torres*, 770 F.3d 398 (2014).  The *Torres* court declined to consider that *Peterson* should be a "blanket blessing on every factual finding in a major misconduct hearing." *Torres*, 770 F. 3d at 406.  The Sixth Circuit in *Torres* went on to state that:

> [O]ur decision to accord preclusive effect to particular findings from Peterson's prison hearing necessarily turned, at least in part, on the particular circumstances of Peterson's case. Indeed, the question of preclusion cannot be resolved categorically, as it turns on case-specific factual questions such as what issues were actually litigated and decided, and whether the party to be precluded had sufficient incentives to litigate those issues and a full and fair opportunity to do so—not just in theory, but in practice. *Id.* at 916-17. It likewise turns on the court's "sense of justice and equity," *Blonder-Tongue Lab., v. University of Illinois Found.*, 402 U.S. 313, 334, 91 S. Ct. 1434, 28 L. Ed. 2d 788 (1971), which may require a case-by-case analysis of surrounding circumstances.  *Id*.

Defendants maintain, however, that, even applying a case-specific approach to the case at hand, *Torres* is distinguishable from this case.  In *Torres*, the plaintiff had not yet appealed the hearing officer's decision to uphold the assault

8

and battery ticket to the state circuit court for decision, as plaintiff did here.  In

fact, the *Torres* court determined that the parties had failed to even raise the issue

of preclusion in the district court.  This is because *Torres* was decided at the

district court level before the *Peterson* case was issued.  The *Torres* court

ultimately remanded the case to the district court for careful consideration of the

fairness and accuracy of the hearing officer's decisions.  Defendants assert that if

the Court applies *Torres*, it should conclude that plaintiff had a full and fair

opportunity to present his arguments that defendants falsified documents and lied

to get him convicted of an attempted escape charge, despite his claimed innocence.

Defendants also contend that they are entitled to dismissal of the complaint

based on qualified immunity.  In order to demonstrate a violation of his right to

substantive due process, plaintiff must definitively demonstrate that defendants

filed a false misconduct ticket against him where plaintiff was subject to

segregation and loss of "good time" credit.  *Scott v. Churchill*, 861 F.2d 943 (6th

Cir. 1988).[1]  Or plaintiff must demonstrate that officers maliciously framed him for

an offense and caused him to be subject to a risk of prolonged incarceration.  *Cale*

*v. Johnson*, 861 F.2d 943 (6th Cir. 1988).  According to defendants, the post

discovery evidence points to the fact that plaintiff can demonstrate neither.

---

[1]  The cite in defendants' brief for *Scott v. Churchill* is actually 377 F.3d 565 (6th Cir. 2004).  Defendants appear to used the citation for *Cale v. Johnson* in error.

Although incarcerated in administrative segregation for a period of 18 months, plaintiff has not alleged that he lost any disciplinary credit or time, or that he would have been released from prison sooner without receiving the misconduct ticket.  He cannot establish why defendants, all of whom had very limited experience with plaintiff before this incident would pick him out at random as an individual who attempted to escape from the facility on December 24, 2008.

Further, the evidence compiled and presented to the hearing officer, including the witness statements of Ms. Winters and Ms. Wambold, in conjunction with the video, served as the basis for the hearing officers decision to uphold the ticket, despite plaintiff's availing himself of appeals with regard to his misconduct conviction, and presenting the same arguments that he now presents to this Court, and the hearing result was upheld consistently.  According to defendants, plaintiff has failed to establish that they violated his clearly established rights under any provision of the United States Constitution.  For the reasons stated above, defendants Bernstein, Peiffer, and Conachan are entitled to qualified immunity.

B.     Plaintiff's Arguments

According to plaintiff, this Court has already considered and rejected defendants' argument that plaintiff's claims are precluded by the factual findings of the hearings officer and the Circuit Court under *Peterson*. "Under the law-of-the-case doctrine, findings made at one point in the litigation become the

10

law of the case for subsequent states of that same litigation." *Rouse v. DaimlerChrysler Corp*, 300 F.3d 711, 715 (6th Cir. 2002). Therefore, plaintiff maintains that defendants' motion should be denied on this basis.

Plaintiff next argues that *Peterson* does not preclude his claims. Plaintiff points to *Roberson v. Torres*, 770 F.3d 398 (6th Cir. 2014) which limits the application of *Peterson* to the facts of that case. In *Torres*, the Sixth Circuit stated "*Peterson* is not a blanket blessing on every factual finding in a major-misconduct hearing." *Id*. at 404. The relevant question is "whether the party to be precluded had sufficient incentives to litigate those issues and a full and fair opportunity to do so – *not just in theory, but in practice*." *Id*. at 405 (emphasis added).

Defendants point out that during the hearing and appeal of the misconduct ticket, the hearings officer and the circuit court judge considered and rejected plaintiff's argument that 1) the date on the ticket was changed; 2) he was denied access to Officer Winters and Constance Wambold as witnesses; and 3) that the hearing officer erroneously stated that he saw plaintiff exiting the window. (*See* Dkt. 85, pp. 14-15). Plaintiff counters that these are procedural defects that plaintiff raised in an effort to have the ticket dismissed that were deemed irrelevant by the reviewing officials. (Dkt. 88, Ex. M, Hearing Report). But, according to plaintiff, there was never any review, consideration, or factual determination of plaintiff's current claims that defendants violated his substantive

due process rights by fabricating evidence against him and concealing exculpatory evidence. *See Tucker v. Pentrich*, 2015 U.S. Dist. LEXIS 13915, 26-27 (E.D. Mich. Jan. 13, 2015) (Ex. T) ("While the hearing officer deemed it 'irrelevant,' that is not the same as providing plaintiff with the means to vigorously contest the charges.").

Moreover, according to plaintiff, *Torres* requires the court to analyze the "surrounding circumstances" and to consider the court's "sense of justice and equity." 770 F.3d at 405. Here, not only did plaintiff not have the opportunity to raise his claims at the time of his initial hearing -- plaintiff did not have the opportunity to raise these claims because of defendants' acts. During the time of plaintiff's hearing and appeals on the misconduct ticket, he was locked in solitary confinement due to the false charges against him. And the officers who were in charge of collecting evidence to present to the hearing officer were the individuals who were actively concealing the very evidence that could help him. Plaintiff contends that to apply *Peterson* here to preclude plaintiff's claims would actually reward defendants for their constitutional violations and that such a result cannot be considered just and equitable.

Like the question of preclusion under *Peterson*, plaintiff asserts that the Court has already decided that there are questions of fact that preclude summary judgment on the issue of qualified immunity. Moreover, contrary to defendants'

claims, plaintiff maintains that there is ample evidence showing issues of material fact regarding defendants' constitutional violations.  Plaintiff says he has supported his allegations with ample evidence as follows:

Defendants Peiffer and Bernstein were responsible for the collection of reports and evidence that formed the basis of the misconduct charge against plaintiff.  They knew that officer Bryson had responded to an alarm in the Visiting Room Yard during the time of the alleged escape and deemed it "all clear."  Yet, they declined to have him complete a report of his involvement.  Plaintiff requested information that would have disclosed officer Bryson's role.  Defendant Conachan refused to pursue it.

Both Officer Wood and defendant Peiffer testified that they do not believe it possible that the sheets were placed on the wall during the time that the video supposedly shows a prisoner exiting the window.  Defendants failed to explain these timing discrepancies in their incident reports.  Moreover, plaintiff requested information (logbooks, video, witness questions) that would have exposed the discrepancies.  This evidence was withheld from plaintiff at the hearing stage and then wrongfully destroyed, despite defendants' obligation to collect and maintain it. (Dkt. 88, Ex. H, Conachan Dep. Tr. at 21-22).

Marvin Kennedy submitted an affidavit stating that defendant Bernstein intimidated him, threatened him against testifying on plaintiff's behalf, and offered

13

privileges if he testified against plaintiff. Garett Patton submitted an affidavit

stating that he witnessed two prisoners (other than plaintiff) discussing the escape

attempt and could identify the real suspect. Officer Bernstein ignored Patton's

information and failed to investigate the claims or disclose them to plaintiff.

Defendant Conachan, who was in charge of assisting plaintiff in mounting a

defense essentially failed to obtain any evidence on plaintiff's behalf. The only

witness who could purportedly identify plaintiff on the video, Officer Winters,

was on "vacation" for a week. So defendant Conachan simply ignored those

questions. Conachan failed to collect or preserve any of the relevant videos

pictures, or statements that would have provided a defense.

None of the defendants, each of whom were responsible for investigating

the alleged escape attempt and collecting evidence disclosed the fact that the State

Police had taken fingerprints of the area. These fingerprints were shown not to

match those of plaintiff. When viewed as a whole, and in the light most favorable

to plaintiff, plaintiff contends that the evidence shows a concerted effort to find a

scapegoat for the alleged escape and prevent plaintiff from mounting any sort of

effective defense.

According to plaintiff, the Sixth Circuit has held that similar allegations of

fabricated evidence and false charges violate a prisoner's clearly established

constitutional rights. *See Cale v. Johnson*, 861 F.2d 943, 953-954 (6th Cir. 1988).

14

As explained by Judge Nelson in his concurrence:

> For the government knowingly to railroad someone into confinement by planting false evidence on his person is directly comparable, by my lights, to railroading a person into confinement through a kangaroo court proceeding in which the accused has no opportunity to be heard. Both procedures strike me as the very antithesis of "due process" in the true sense of that term.

*Id*. at 953-954; *see also Scott v. Churchill*, 377 F.3d 565, 572 (6th Cir. 2004) (holding that the filing of a false misconduct charge against plaintiff prisoner was the violation of a clearly established right, precluding the defendant's claim of qualified immunity); *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) (denying motion for summary judgment on qualified immunity where prison officer allegedly filed false disciplinary charges against plaintiff in retaliation for his cooperation with a state administrative investigation).  Accordingly, plaintiff asserts that he deserves to present his claims to a jury.

   C.   Defendants' Reply

   According to defendants, without citing to any authority, plaintiff claims that "Defendants fabricated evidence, intimidated witnesses and concealed potentially exculpatory evidence ultimately leading to plaintiff's detention in solitary confinement for sixteen months, along with a loss of valuable privileges." (Dkt. 88).  Defendants submit that the record in this matter has not revealed that any of the above stated scenarios occurred, other than the fact that as a result of

15

being found guilty by an administrative law judge of an attempted escape major

misconduct, plaintiff was placed in administrative segregation for a period of time.

(Dkt. 85, Ex. C, pg. 1).

Additionally, defendants assert that plaintiff incorrectly states in his

response that "Officer Winters is the only person who claims to be able to identify

plaintiff or any other prisoner in the video."  (Dkt. 88, Pg ID 1041).  Plaintiff also

identified Officer Winters as "the only individual who was purportedly able to

identify plaintiff in the video of the food service area" and questioned why

defendant Conachan failed to seek a delay in plaintiff's administrative hearing.

(Dkt. 88, Pg ID 1044).

Defendants also state that plaintiff is incorrect that Officer Winters is the

only individual to have identified plaintiff on camera and his statements in his

response are misleading. As pointed out in their motion for summary judgment

(Dkt. 81, Pg ID 863-64, 869, Ex. J), witness Constance Wambold, who was

employed at the Thumb Correctional Facility (TCF) as a food service supervisor

and was on duty during the night in question in this matter testified that plaintiff

was missing for a period of time in the dining hall during the evening of December

24, 2008.  She also stated that she identified plaintiff on camera during plaintiff's

criminal case.  *Id*.

Another statement that defendants believe to be incorrect is plaintiff's

16

assertion that evidence such as logbooks, video, and witness questions, were withheld from plaintiff at the hearing stage and then wrongfully destroyed "despite defendants' obligation to collect and maintain it."  Plaintiff cites to the transcript of Conachan to emphasize this point.  (Dkt. 88, Pg ID 1056). However, according to defendants, Conachan did not testify that anything was "wrongfully destroyed from plaintiff.  The cited testimony indicates that Conachan acknowledged that certain records have retention schedules but here, plaintiff has presented no evidence that any evidence was "wrongfully destroyed."

Defendants also argue that *Tucker v. Pentrich* can be distinguished from the case at hand because in *Tucker*, plaintiff maintained that his hearing was a sham. Here, however, plaintiff failed to participate fully in the hearing on his own behalf. The January 7, 2009 hearing report indicates that while plaintiff initially participated in the hearing on his own behalf, that plaintiff requested to be escorted back to his cell during the hearing, not wishing to participate further. (Dkt. 88, Ex. C, pg. 1).  Plaintiff admitted during his deposition that this was in fact the case.  (Dkt. 88, Ex. B, pp. 59-61).  Therefore, in the case at hand, defendants contend that plaintiff cannot claim that the entire hearing was a sham.

     D.    Parties' Post-Hearing Supplemental Briefs

          1.    Destruction and withholding of evidence

During oral argument, plaintiff's counsel stated that defendants had

17

destroyed relevant evidence that would have supported plaintiff's claims.

Specifically, plaintiff took issue with the fact that the Electronic Monitor log,

which was located and maintained in the Thumb Correctional Facility Control

Center was not produced in discovery.  However, defendants point out that they

produced many other log books that plaintiff requested during the course of

discovery in this matter, as well as the state retention schedule for document

retention.  (Dkt. 91, Ex. A, "Retention Schedule"; Ex. B "Logbook entries for

Control Center"; Ex. C "Defendants' Response to Subpoena").

       According to defendants, the first request by plaintiff for the Electronic

Monitor log, occurred during discovery in this matter.  According to the retention

schedule for electronic logs, retention of such documents is only one year.  (Dkt.

91, Ex. A, pg. 33).  It does not appear that plaintiff ever requested the Electronic

Monitor log as part of his hearing investigation, although plaintiff did request the

Control Center log book.  (Dkt. 91, Ex. D, "Hearing Investigation Report").  And,

plaintiff admits in his petition to the state circuit court that it was the hearing

officer (who has been dismissed from this case) who deemed the evidence that

plaintiff requested to be relevant or not relevant.  (Dkt. 91, Ex. E, "Excerpt from

Plaintiff's Petition").  Defendants produced the Control Center logbook in

response to plaintiff's discovery requests.  (Dkt. 91, Exs. B and C).  According to

defendants, a review of this document does not reveal any exculpatory evidence

that would demonstrate that plaintiff did not commit the offence of attempted escape.  Nor does the document reveal or even suggest that defendants falsified documents in order to wrongfully convict plaintiff of the escape charge.

Defendant Conachan, during his deposition testimony, stated that an administrative assistant and not defendants were responsible for adhering to the MDOC retention schedule.  Further, defendant Conachan testified that all documents that were given to him as a result of his investigation into the misconduct allegations were placed into the hearing file, whether he deemed it relevant or not.  The hearing officer ultimately decided relevancy of an item. (Dkt. 91, Ex. F, "Excerpts from Conachan Deposition", pp. 13, 25).  Defendants submit that plaintiff's claim that defendants willfully destroyed documents that would have supported plaintiff's case is unfounded, as demonstrated by the documents that were produced in response to discovery, (Dkt. 91, Exs. A-C), and by the fact that it does not appear that the Electronic Monitor Log was ever requested by plaintiff until 2014 during discovery in this matter, which would have been long past the retention schedule for an event occurring in 2008.  (Dkt. 91, Exs. A, C, D).

Plaintiff contends that defendants' arguments that they were not personally responsible for collecting and preserving relevant documents is unfounded because, independent of any department policy, defendants have a duty to preserve

evidence that the party knows, or should know, is, or might be, relevant to legal claims. *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008). Once litigation is reasonably anticipated, a party must preserve all "unique, relevant evidence that might be useful to an adversary." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003). Thus, setting aside MDOC retention schedules or specific document requests, plaintiffs maintain that defendants had a duty to preserve relevant evidence beginning, at the latest, in October, 2009, when plaintiff filed this lawsuit. And, even according to the MDOC document retention schedule, plaintiff points out that there are no relevant documents that would (or should) have been purged prior to the time plaintiff filed this lawsuit.

Plaintiff also contends that defendants are incorrect in asserting that plaintiff did not request the electronic monitor log until 2014. In preparation for his original hearing in 2009, plaintiff asked his hearing investigator (defendant Conachan) to collect information including:

> per control center log book, what was the last time a TCF staff member looked around the visiting yard for the purpose of any type of perimeter/security check on 12-24-08 prior to the discovery of said sheets? What was his/her findings? What was the exact time?

(Dkt. 88, Ex. J, p. 3 ¶ 10). And, in plaintiff's 2011 discovery requests, plaintiff requested "electronically stored information, specifically a printout of the security systems electronically logged activations for 12-24-08. . ." (Dkt. 94, Ex. A ¶ 5).

20

Thus, even if plaintiff did not ask for the "Electronic Monitor Log" by its precise

name, he did specifically ask for information that would have been contained in

that log.

Moreover, plaintiff points out that it was defendant Conachan's job, as

Hearing Investigator, to gather all relevant evidence.  The MDOC Hearing

Handbook states regarding a Hearing Investigator's duties:

> The full investigation of a case is absolutely essential to
> a fair hearing. Due to the prisoner's necessarily limited
> access to other prisoners and staff in a prison the
> Department has provided hearings investigators to obtain
> witness statements and documents relevant to a major
> misconduct charge. . . Investigators are essential for
> those who are in segregation, on toplock, or in jail
> pending their hearing, and for those who are unable to
> prepare their own case due to limited education or
> ability. Unless a case is thoroughly investigated, with
> particular attention to points of discrepancy between the
> misconduct report and the prisoner's version, the hearing
> officer may not have sufficient information on which to
> make a decision.

(Dkt. 88, Ex. H, p. 2, ¶ C1).  Likewise, Policy Directive 03.03.105 states that

"[t]he Hearing Investigator shall gather all witness statements and other evidence

necessary to conduct a hearing and not simply respond to the questions raised by

the prisoner." (Dkt. 94, Ex. B, ¶ U, emphasis in original).

These policies are also consistent with defendant Conachan's testimony

regarding his job description:

Q. Okay. And tell me what is it -- give me a rough idea of what the hearings investigator does?

A. Basically the hearings investigator job is to gather all relevant information related to the charge that has been presented to the hearings process.

Q. And what sources do you look for for relevant information?

A. It would depend on the circumstance of the misconduct of to what I would go through, but you could go through staff witnesses, victims, inmate witnesses, victims, video. Also have gotten phone recordings if it was related to that, physical evidence if -- per se if it was an assault, you know, pictures. You could also take pictures of areas, still pictures, like it happened in this area or there was blood or something to that effect.

(Dkt. 94, Ex. C at 11-12).  Thus, plaintiff contends that defendant Conachan concedes that his duties go beyond just collecting what plaintiff asked for and placing the material he was given into the file – he was supposed to collect all relevant evidence on plaintiff's behalf.  According to plaintiff, defendant Conachan further conceded that information regarding the fingerprint investigation was relevant and should have been included in the file and presented to the Hearing Officer:

Q. If you were aware of fingerprints being taken would you consider that to be a relevant piece of evidence?

A. Absolutely. At least relevant enough to put in the packet.

22

(Dkt. 94, Ex. C at 37).

Plaintiff also contends that the fact that the Hearing Officer makes the ultimate determination of relevancy does not excuse the failure to collect and preserve evidence because the investigator makes the initial determination of what to present to the Hearing Officer. As defendant Conachan testified:

> Q. So if I understand, if a prisoner asks for information you would decide whether that information was relevant or not?
>
> A. Initially I would break down to the best of my ability whether specific questions were relevant to the charge at hand –
>
> Q. Okay.
>
> A. -- and -- but beyond that I would then ask the questions and then all my information would then be forwarded to the hearings officer, which would also include the inmate's request for what he wanted.

(Dkt. 94, Ex. C at 15).

Defendants also claim they should not be held responsible for the failure to preserve relevant documents because "an administrative assistant and not Defendants were responsible for adhering to the MDOC retention schedule." (Dkt. 91). According to plaintiff, that is not what the attached transcript states. Rather, Conachan testified that it was his responsibility to maintain, and eventually purge, the records that were retained:

Q. So after a hearing takes place what happens with all the evidence that you collect?

A. Everything is put in a packet and all the packets from that day are put together and put away in storage.

Q. And are you responsible for maintaining the storage of those documents or the hearings investigator?

A. The hearings investigator is.

Q. And then is there some schedule that they are destroyed?

A. If I'm -- it's either five or seven years. I believe they're supposed to be maintained unless they -- unless the facility's been notified that there is an active or pending suit.

Q. Sure. Right. And I won't hold you to the number.

A. Right.

Q. Right. I understand there is a written policy, but I guess what I'm getting at is who is responsible for getting rid of them after -- after the period runs out?
**A. I -- I did that, the hearings investigator.**

(Dkt. 94, Ex. C at 21-22, emphasis added).  Accordingly, plaintiff contends that

questions of fact remain regarding whether defendants concealed and excluded

relevant evidence that plaintiff should have had available for his defense.

2.     Administrative Segregation

At the hearing on defendants' most recent motion for summary judgment,

defendants argued that plaintiff's substantive due process claims must fail because

he was sentenced to a prison term of "life" without parole.  Defendants argue

that plaintiff's 16-month confinement in administrative segregation does not

amount to a deprivation of plaintiff's constitutionally protected liberty interests

because there could be no extension of his prison term.  According to plaintiff, this

argument ignores controlling precedent to the contrary.  Plaintiff points to

Supreme Court precedent holding that whether segregated confinement deprives a

prisoner of a liberty interest depends on whether such confinement "imposes

atypical and significant hardship on the inmate in relation to the ordinary incidents

of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995).  In *Harden-Bey v*

*Rutter*, 524 F.3d 789, 793 (6th Cir. 2008), the Sixth Circuit considered whether a

prisoner who was held segregation on an indefinite basis for three-plus years was

deprived of his liberty without due process.  The Court surveyed the decisions of

other circuits and found that "most (if not all) of our sister circuits have the nature

of the more-restrictive confinement and its duration in determining whether it

imposes an "atypical and significant hardship."  For example, the Second Circuit

applies a bright line rule that "[s]egregation of longer than 305 days . . . is

sufficiently atypical to require procedural due process protection)."  *Iqbal v. Hasty*,

490 F.3d 143, 161 (2d Cir. 2007). *Cf Hatch v. District of Columbia*, 184 F.3d 846,

858 (D.C. Cir. 1999) ("even if the conditions [the inmate] faced were no more

restrictive than ordinary conditions of administrative segregation, the district court

should determine whether its duration--twenty-nine weeks . . . was 'atypical' compared to the length of administrative segregation routinely imposed on similarly situated prisoners"); *Stephens v. Cottey*, 145 Fed. Appx. 179, 181 (7th Cir. 2005) ("In determining whether prison conditions meet this [*Sandin*] standard, courts place a premium on the duration of the deprivation . . . ."); *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000) (noting that a relevant factor is "the amount of time the prisoner was placed into disciplinary segregation"); *Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 809 (10th Cir. 1999) (remanding case for district court to consider "both the duration and degree of plaintiff's restrictions as compared with other inmates"). Thus, according to plaintiff, the *Harden-Bey* court held that prolonged and indefinite restrictive segregation, by itself, can be a sufficiently atypical and significant deprivation of liberty to deserve due process protection—without regard to any loss of good-time credits or a prolonged sentence. 524 F.3d at 793.

Like the prisoner in *Harden-Bey*, plaintiff contends that he was placed in segregation for an indefinite period of time immediately following the underlying incident. The Segregation Behavior Review reports show that plaintiff was placed in segregation on December 24, 2008 and was cleared for reclassification on April 26, 2010. He remained in segregation for 489 days—well in excess of 305-day threshold the Second Circuit holds to require due process protection. *See Iqbal*,

490 F.3d at 161.  Plaintiff maintains that the prolonged and indefinite nature of plaintiff's confinement indicates an atypical and significant hardship, worthy of due process protection.

In addition to the duration of his confinement, plaintiff's deposition testimony demonstrates that the nature of his confinement is anything but typical or insignificant compared with ordinary prison life.  Plaintiff testified that he was completely alone in his cell 24 hours a day, and was only let out for a shower three times per week:

> A. So whatever you want to call it, segregation or whatever word or terminology you want to use, you never have a cell mate. You're always by yourself.
>
> Q. Okay. And you have a certain amount of time per day for yard—correct? —when you're in segregation?
>
> A. No. You're in the hole, you're in the cell all day, 24 hours. Some—
>
> Q. Excuse me. You're saying you never go out for yard during the day?
>
> A. Yeah, well, you get—I think you get out three times a week.
>
> Q. Okay.
>
> A. Maybe three times a week. And you get a shower three times a week. And other than that, you're in your cell.

(Dkt. 92, Ex. B at 49-50).

Furthermore, even when let out of his cell, plaintiff says he was treated like a "caged animal." His visitation privileges were taken away, and he was subjected to the deranged behavior of mentally ill prisoners:

> A. I mean, to start with—to start with, I was taken from a Level II facility and placed in a Level V facility. I was placed in—I was taken out of a place where I could move around 15 hours a day almost and placed into a cell where I couldn't come out at all. And when I did come outside, it was being placed in a dog cage, like a kennel—what I can only describe as a kennel. My father—I was completely separated from being able to see my family. I couldn't receive visitors. I lost all my visitation rights. My father, when he heard about the incident, he suffered a stroke. I mean—(Witness crying)
>
> ***
>
> A. Then they tried to threaten me to prosecute. They threatened me with another life sentence. And I mean, it was just—it's a mess. And then just being in the hole all that time and having to deal with the situation. You're around people that I can only describe as being mentally unstable; that scream, banging on doors all day. Every time you come out of the cell, they're throwing urine and feces on one another. I mean, it was a lot; it was a lot. It was a whole lot to go for me.

(Dkt. 92, Ex. B at 76-77). In short, plaintiff maintains that his 439-day confinement under extreme isolation was anything but typical or insignificant and that, at a minimum, a question of fact exists as to the degree of plaintiff's hardship compared to the "ordinary incidents of prison life." *Sandin*, 515 U.S. at 484.

While plaintiff claims that defendants "had not contested plaintiff's allegation that he was deprived of liberty without due process at any point during

28

the 6 years the case has been pending," defendants assert that this is an incorrect
statement.  According to defendants, at no time in any of the motions filed by
defendants for summary judgment, do defendants concede that plaintiff did not
receive due process.  (Dkt. 13, Pg. ID 45-46; Dkt. 35, Pg. ID 246-248; Dkt. 50, Pg.
ID 498-500; Dkt. 85, Pg. ID 872-874).  According to defendants, the fact that
plaintiff chose not to pursue discovery specifically regarding his administrative
segregation conditions is of no consequence.  Plaintiff was not prevented from
obtaining discovery regarding his confinement and defendants did not have an
obligation to direct plaintiff's discovery.  In this matter, he chose not to pursue
discovery regarding this issue.  According to defendants, they raised the issue of
plaintiffs confinement in segregation in their most recent motion for summary
judgment to point out to this Court that plaintiff's damages are minimal.  (Dkt. 85,
Pg. ID 874).

As to plaintiff's claim that his confinement in administrative segregation
following his misconduct conviction for the December 24, 2008 attempted escape
was an "atypical and significant hardship," defendants maintain that it is well
settled that prisoners have no cognizable liberty interest that entitles him or her to
procedural protection as a result of an extended stay in administrative segregation.
*Sandin v. Conner*, 515 U.S. 472, 485 (1995).  In fact, "[a] prisoner has no right to
be classified to any particular security level, *Olim v. Wakinekona*, 461 U.S. 238,

245 (1983) or to remain free of administrative segregation." *Mackey v. Dyke*, 111 F.3d 460, 462 (6th Cir. 1997).

Defendants contend that plaintiff's argument, that the duration of his confinement in segregation was excessive is a similar argument made in a case brought in the Western District of Michigan entitled *Harris v. Caruso*, Sixth Circuit Case No. 09-2191. (Dkt. 93, Ex. A). In that case, the plaintiff was housed in administrative segregation after assaulting a prison employee. The plaintiff's confinement exceeded eight years. The Sixth Circuit found that while the length of time of Harris's segregation was atypical, that Harris received meaningful periodic reviews of his confinement, even though he claimed that the reviews were a sham. (Dkt. 93, Ex. A, pp. 5-10). In this case, plaintiff also challenges the post segregation reviews that he received claiming that they were "completely perfunctory." (Dkt. 92, Pg ID 1279; Dkt. 92-2). According to defendants, plaintiff received monthly segregation reviews where comments were made regarding plaintiff's behavior as well as rationales for continued placement in segregation. (Dkt. 92-2). Defendants point out that they did not have any involvement, as indicated on the face of these forms, in making these decisions. Thus, defendants urge the Court to reject plaintiff's insinuation that they were responsible for his continued placement in segregation because defendants had no role in extending Plaintiff's stay in administrative segregation beyond what he initially received as a

sanction for the misconduct ticket.

Further, defendants also claim that plaintiff's conditions of confinement were not atypical, citing the MDOC policy on Segregation Standards. (Dkt. 93, Ex. B, PD 04.05.120). This policy describes the types of segregation as well as hearings necessary for confinement in administrative segregation. (Dkt. 93, Ex. B, ¶ L, #3-4; ¶¶ O-T). Section V of this policy describes the items that prisoners in administrative segregation are allowed to keep with them in their cells and the services that they have access to. Section W describes what programming prisoners are permitted. (Dkt. 93, Ex. B, ¶¶ V-W). Paragraphs BBB –HHH discuss how a prisoner is reviewed and released from segregation, making clear that no defendants to this action were involved in the process at this level. *Id.* According to defendants, plaintiff's claim that his out of cell time was restricted, that his family could no longer visit (although they could still correspond by mail by policy), that he was allowed to shower three times per week has not risen to the level of an atypical and significant hardship.

## III.   ANALYSIS AND CONCLUSIONS

### A.   Law of the Case

As a preliminary matter, in the view of the undersigned, nothing in Judge Hood's decision bars defendants from bringing this motion or from making the arguments based on *Peterson* and qualified immunity. She certainly left open the

door that *Peterson* could be substantively addressed after the record was complete, which was the very reason that *Peterson* could not be fully addressed when she ruled on the motion for reconsideration. In addition, the qualified immunity argument that was rejected in our report and recommendation, and adopted by Judge Hood, was entirely dependent on the success (or failure) of the defendants' primary argument, which was also rejected. Here, the qualified immunity argument is quite different and was not previously addressed in the report and recommendation or either of Judge Hood's decisions. Thus, the substance of defendants arguments should and will be addressed below.

### B.    Qualified Immunity

Defendants argue that plaintiff's claims should be dismissed based on qualified immunity. They allege that plaintiff's due process claim fails because plaintiff has not demonstrated that plaintiff was subject to a loss of "good time" credits; that is, defendants contend that because plaintiff is serving a life sentence without parole and he cannot be subjected to a longer sentence based on his stay in administrative segregation, his due process claim must fail. Defendants also claim that plaintiff cannot demonstrate that they maliciously framed him for an offense and caused him to be subject to a risk of prolonged incarceration. (Dkt. 85, Pg ID 873-874).

The question presented by defendants' qualified immunity argument is

whether a substantive due process claim requires the same loss of liberty (being subject to prolonged incarceration) as a procedural due process claim. Judge Quist discussed this in *Robinson v. Unknown Schertz*, 2007 WL 4454293 (W.D. Mich. 2007). Pointing to *Cale v. Johnson*, Judge Quist noted that the Sixth Circuit "concluded that the plaintiff's allegations–that the defendants maliciously framed him for an offense, thereby subjecting him to a risk of prolonged incarceration resulting from the loss of good-time credits–demonstrated an egregious abuse of governmental power sufficient to support a substantive due process violation." *Id.* at *1, citing *Cale v. Johnson*, at 950. Then, in *Scott v. Churchill*, the defendant argued that *Cale* was distinguishable because the defendants in *Cale* had someone plant drugs on the plaintiff and they actually placed him in administrative segregation, whereas in *Scott* the defendant merely filed a false misconduct charge, and the plaintiff was never placed in administrative segregation. *See id.* at 571-72. As Judge Quist explained, the court rejected both arguments, noting first that there is no basis for distinguishing between planting drugs on a prisoner and giving false testimony against a prisoner, and second, that the focus of *Cale* was not on the brief administrative detention, but rather upon the danger of further loss of liberty entailed by potential administrative detention and loss of good-time credit. *See id.* In *Cale*, the court distinguished other cases concluding that the substantive due process claims had failed based on the lack of a threat of

incarceration, because the plaintiff in *Cale* was "in danger of further loss of liberty through disciplinary detention and through the loss of good-time credit as the result of the charges filed against him." *Cale*, at 949-950.

Virtually all case law addressing when confinement in administrative segregation reaches the level of a federally cognizable liberty interest under the Due Process Clause, do so in the context of *procedural* due process, not substantive due process. As explained in *Newell v. Borgen*, 2015 WL 437675, at *3 (W.D. Mich. 2015), the Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement as having an impact on a prisoner. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a prisoner's loss of liberty implicates a federally cognizable liberty interest protected by the Due Process Clause. According to *Sandin*, a prisoner is entitled to the protections of due process only when a deprivation "will inevitably affect the duration of his sentence" or imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 486-87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995).

Confinement in administrative segregation "is the sort of confinement that inmates should reasonably anticipate receiving at some point in their

34

incarceration." *Hewitt v. Helms*, 459 U.S. 460, 467-73 (1983).  Thus, it is

considered atypical and significant only in "extreme circumstances." *Joseph v.*

*Curtin*, 410 Fed.Appx. 865, 868 (6th Cir. 2010). Generally, courts will consider

the nature and duration of a stay in segregation to determine whether it imposes an

"atypical and significant hardship." *Harden-Bey v. Rutter*, 524 F.3d 789, 794 (6th.

Cir. 2008).  The *Newell* court points out that in *Sandin*, the Supreme Court

concluded that the segregation at issue in that case (disciplinary segregation for 30

days) did not impose an atypical and significant hardship.  *Sandin*, 515 U.S. at

484.  Similarly, the Sixth Circuit has held that mere placement in administrative

segregation, or confinement in segregation for a relatively short period of time,

does not require the protections of due process.  *Rimmer-Bey*, 62 F.3d at 790-91;

*see Joseph*, 410 Fed.Appx. at 868 (61 days in segregation is not atypical and

significant).  Thus, the *Newell* court concluded that the plaintiff's confinement in

administrative segregation for approximately five days pending review of the

misconduct charges is not atypical and significant and, thus, does not give rise to a

protected liberty interest.  *Id*. at *3.

    Moreover, significantly lengthy stays in administrative segregation have

been held not to implicate any liberty interest.  In *Jones v. Baker*, 155 F.3d 810,

812 (6th Cir. 1998), the Court of Appeals held that a two and-one-half year stay in

administrative segregation was not a constitutionally-significant loss of liberty,

noting that administrative segregation is not the type of hardship "implicating a protected liberty interest" and this holds true even if the inmate has been in such segregation for an "extraordinarily long time . . . ." *Id*., citing *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995); *see also McMann v. Gundy*, 39 Fed.Appx. 208, 210 (6th Cir. 2002) (five months in administrative segregation not an atypical and significant hardship); *Merchant v. Hawk-Sawyer*, 37 Fed.Appx. 143 (6th Cir. 2002) (unpublished) (sixteen months in administrative detention and twenty-one months in a special housing unit did not amount to due process violation or cruel and unusual punishment); *Mackey v. Dyke*, 111 F.3d 460 (6th Cir. 1997) (no atypical or significant hardship when inmate placed in segregation for one year upon being found guilty of possession of illegal contraband and assault where reclassification delayed due to overcrowding).  Notably, none of these cases involved a *substantive* due process claim.[2]  Rather, they all involved procedural due process claims.

In *Thomas v. Russell*, 202 F.3d 270 (6th Cir. 2000) (unpublished opinion), the court explained that a substantive due process claim based on a conviction supported by false evidence does not require separate proof of an independent constitutional violation.  The *Thomas* plaintiff alleged that the defendants

---

[2]  *Rimmer-Bey* briefly mentioned plaintiff's substantive due process claim, which was summarily dismissed in a footnote because plaintiff did not allege any government conduct that would "shock the conscience."  *Id*. at 791, n. 4.

permanently denied him visitation with his wife after prison officials found a
marijuana cigarette baked into a cake that his wife had mailed to him.  The
plaintiff alleged that he learned later, through a conversation with an Ohio
assistant attorney general, that the substance in the cake was not actually
marijuana.  The district court determined that the defendants were entitled to
summary judgment as a matter of law because the plaintiff's claim of the denial of
visitation does not present an atypical or significant hardship beyond the ordinary
incidents of prison life.  *Id*. at *1, citing *Sandin v. Connor*, 515 U.S. 472, 484-86
(1995); *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 461 (1989)
(the denial of visitation is ordinarily contemplated by a prison sentence); *Bellamy
v. Bradley*, 729 F.2d 416, 419-20 (6th Cir. 1984) (there is no absolute
constitutional right to visitation).  The Sixth Circuit concluded that although the
district court may have been correct in finding no absolute right to visitation, the
plaintiff's "claim sounds as a claim that prison officials continue to punish him on
the basis of false evidence, as proved by the party admission of the Ohio assistant
attorney general."  *Id*.  Thus, the plaintiff's claim did "not fit neatly under *Sandin's*
purview, but rather appears to present a claim of substantive due process based on
an alleged abuse of governmental authority."  *Id*. at *1, citing *County of
Sacramento v. Lewis*, 523 U.S. 833 (1998).

  The Sixth Circuit's conclusions are well-supported by case law from various

other circuits and districts around the country.  As explained in *Dulaney v. Dyer*,

2015 WL 269244, *6 (E.D. Cal. 2015), the right to substantive due process

protects individuals from being deprived of certain fundamental rights; in other

words, no amount of government process can justify the taking of these important

rights.  *Id*., citing *Blaylock v. Schwinden*, 862 F.2d 1352, 1354 (9th Cir. 1988).

The Ninth Circuit has recognized "a clearly established constitutional due process

right not to be subjected to criminal charges on the basis of false evidence that was

deliberately fabricated by the government."  *Dulaney*, at *6, quoting *Devereaux v.

Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001); *see also Costanich v. Dep't of

Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010) (relying on *Devereaux*

to hold that a state investigator "who deliberately mischaracterizes witness

statements in her investigative report also commits a constitutional violation").

The Eighth Circuit has reached a similar conclusion, holding that a police officer's

use of false evidence to secure a conviction violates a defendant's substantive due

process rights.  *White v. Smith*, 696 F.3d 740, 754 (8th Cir. 2012), citing *Wilson v.

Lawrence County*, 260 F.3d 946, 954 (8th Cir. 2001) and *Napue v. Illinois*, 360

U.S. 264, 269 (1959).  The Eighth Circuit has "recognized that a plaintiff can

make out a violation of substantive due process by 'offer[ing] evidence of a

purposeful police conspiracy to manufacture, and the manufacture of, false

evidence.'" *White*, 696 F.3d at 754, quoting *Moran v. Clarke*, 296 F.3d 638, 647

(8th Cir. 2002) (*en banc*). "There can be little doubt that intentionally manufacturing false evidence to convict a criminal defendant is the sort of 'brutal and inhumane abuse of official power' that shocks the conscience." *White*, 696 F.3d at 758, quoting *Moran*, 296 F.3d at 647. Indeed, "the right to be free from a conviction purposefully obtained by false evidence and false testimony has long been clearly established." *Id*. at 759, citing *Napue*, 360 U.S. at 269 and *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (*per curiam*); *see also Molina-Aviles v. District of Columbia*, 824 F.Supp.2d 4 (D. D.C. 2011) ("A conviction obtained through the knowing use of false evidence, or through the knowing failure to correct false evidence, violates due process.").

Defendants' qualified immunity argument is hinged on the notion that plaintiff is required to show that he was subject to longer incarceration as a result of the misconduct conviction. However, a showing of such a liberty interest is only required for a procedural due process claim. It is clear from the cases discussed above that the liberty interest at issue when a claim for substantive due process is made under these circumstances is the right to be free from a conviction based on falsified evidence or perjured testimony. *See Deveraux*, *supra*; *Thomas*, *supra*. As observed in *Herndon v. Johnson*, 1992 WL 152713, *20 n. 13 (E.D. Mich. 1992), no amount of procedural protections can cure a *substantive* due process violation. *See also*, *Dulaney*, 2015 WL 269244, *6. Thus, defendants'

39

assertion that they are entitled to qualified immunity because plaintiff's sentence was not extended is without merit.

C.    *Peterson*/Collateral Estoppel

As to defendants' *Peterson* argument, it fails for the same reason such arguments were rejected in *Tucker v. Pentrich*, 2015 WL 477200 (E.D. Mich. 2015). In *Peterson*, the plaintiff's Eighth Amendment claim arose from an incident in which Officers Johnson and Lindy were attempting to put Peterson in his cell. Johnson's hand became stuck in the cell just as the door began to close. Johnson's frantic shouts alerted Lindy to stop the door from shutting on Johnson's hand. "The sole factual dispute in this case—and the fact on which this case hinges—is why Johnson's hand was in the cell. Peterson says Johnson put his hand in the cell as an excuse to pull Peterson out and assault him; Johnson maintains that Peterson grabbed Johnson's hand and pulled it into the cell." *Id*. at 908. The Court analyzed the issue as follows:

> Ordinarily, [the summary judgment] standard of review would require reversing the judgment below. Peterson sharply disputes Johnson and Lindy's account of who grabbed whom, and this disputed fact is material to the case. Indeed, the hand-grabbing dispute is dispositive because it frames the entirety of the "core judicial inquiry" at issue here, which is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34 (2010) (internal quotation marks omitted). If Johnson was just making

40

up an excuse to pull Peterson out of his cell and attack
him, the district court would have erred in finding that
Peterson could not establish the subjective sadistic-intent
prong. *Curtin*, 631 F.3d at 384 (recognizing that courts
frown on even *de minimis* uses of force where the
purpose of the force was "diabolic or inhuman" (quoting
*Hudson v. McMillian*, 503 U.S. 1, 9 (1992))). But if
Peterson grabbed Johnson's hand, put it in danger of
being crushed by the closing cell door, and exited his cell
as a result of Johnson's retrieving his hand, then the
ensuing two-minute effort to free Johnson's hand and
return Peterson to his cell was not only permissible, it
was entirely reasonable. This is true even though
Peterson alleges that he suffered prolonged nerve pain
afterwards, as nothing in his allegations about the force
used against him shows that it was diabolically intended
to harm him.

*Id*. at 910-11.  Despite finding that a genuine issue of material fact existed,

contrary to the lower court ruling, the Court went on to affirm the grant of

summary judgment based on the principle of issue preclusion and the factual

findings made in the administrative proceedings over the misconduct tickets.

Notably, "the party asserting preclusion bears the burden of proof." *United

States v. Dominguez*, 359 F.3d 839, 842 (6th Cir. 2004) (applying Michigan law);

*see also U.S. v. Modanlo*, 493 B.R. 469 (D. Md. 2013) (Under federal common

law, the burden of making a showing on the elements of collateral estoppel is on

the party seeking preclusion.), citing 18 Charles Alan Wright, Arthur R. Miller &

Edward H. Cooper, *Federal Practice and Procedure* § 4421 (2d ed. 2002); *In re

Summerville*, 361 B.R. 133, 141 (B.A.P. 9th Cir. 2007) ("Preclusion is an

41

affirmative matter, and the proponent of preclusion has the burden of proof and
bears the risk of non-persuasion."). As the parties acknowledge, the Sixth Circuit
recently revisited its holdings in *Peterson* in *Robertson v. Torres*, 770 F.3d 398
(6th Cir. 2014), finding its application to be much more limited than as advocated
by defendants in this case. The *Robertson* Court first pointed to what the Supreme
Court held in *University of Tennessee v. Elliott*, that "when a state agency acting in
a judicial capacity resolves disputed issues of fact properly before it which the
parties have had an adequate opportunity to litigate, federal courts must give the
agency's factfinding ... the same preclusive effect to which it would be entitled in
the State's courts." 478 U.S. 788, 799 (citations and quotation and alteration
marks omitted). As observed in *Peterson*, *Elliott* identified "four criteria for, in
the context of a § 1983 case, according preclusive effect to a state administrative
agency's unreviewed factual determination." *Roberson*, 770 F.3d at 403, quoting
*Peterson*, 714 F.3d at 912. In *Roberson*, the Court rejected the defendant's
contention that *Peterson* provides a blanket rule that all findings of fact resulting
from a Michigan prison misconduct hearing are conclusive:

> To the extent that Torres argues that, in light of
> *Peterson*, any factual findings by a hearing officer in a
> major-misconduct hearing in a Michigan prison are to be
> accorded preclusive effect, we reject such a reading of
> *Peterson* as overbroad. *Peterson* is not a blanket blessing
> on every factual finding in a major-misconduct hearing.
> Although the language of our opinion in *Peterson* is at

42

times categorical, our decision to accord preclusive
effect to particular findings from Peterson's prison
hearing necessarily turned, at least in part, on the
particular circumstances of Peterson's case. Indeed, the
question of preclusion cannot be resolved categorically,
as it turns on case-specific factual questions such as what
issues were actually litigated and decided, and whether
the party to be precluded had sufficient incentives to
litigate those issues and a full and fair opportunity to do
so—not just in theory, but in practice. *Id*. at 916–17. It
likewise turns on the court's "sense of justice and
equity," *Blonder–Tongue Labs., v. Univ. of Ill. Found*.,
402 U.S. 313, 334, 91 S.Ct. 1434, 28 L. Ed. 2d 788
(1971), which may require a case-by-case analysis of
surrounding circumstances.

770 F.3d at 404-405.

In the view of the undersigned, defendants have not met their burden under

*Peterson*. The first *Elliott* factor requires that the state agency act in a judicial

capacity. In *Peterson*, the Court held that Michigan major-misconduct hearings

meet this requirement, since the hearing officer considers evidence from both

parties, allows both parties to argue their versions of the facts at a formal hearing,

and issues a written final decision that is subject to direct review in state court.

*Roberson*, 770 F.3d at 403. The second factor asks whether the hearing officer

"resolved a disputed issue of fact that was properly before [him]," and the court

found that, in Peterson's case, the second factor was satisfied. *Id*., at 404, quoting

*Peterson*, 714 F.3d at 913 (quotation marks and alterations omitted). The third

factor asks whether the party to be precluded had an "adequate opportunity to

litigate" the factual dispute. *Id*. The *Peterson* court found that this factor was

satisfied, given the "plethora of statutory protections" and ultimate right of appeal

available to the prisoner. *Id*. The fourth and final factor "provides that if the prior

three are satisfied, then we must give the agency's finding of fact the same

preclusive effect it would be given in state courts." *Id*. As the *Peterson* court

explained,

> The test Michigan courts apply when deciding whether
> to give preclusive effect to an agency's factual
> determination proceeds in two stages and tracks several
> of the Elliott factors. The first stage applies to all cases
> where preclusion is claimed, and asks whether: (1) a
> question of fact essential to the judgment was actually
> litigated and determined by a valid and final judgment;
> (2) the parties had a full and fair opportunity to litigate
> the issue; and (3) there is mutuality of estoppel. The next
> stage applies only to parties seeking to preclude
> litigation on a factual issue that was decided by an
> administrative agency. It asks whether: (1) the
> administrative decision was adjudicatory in nature; (2)
> there was a right to appeal from the decision; and (3) the
> legislature intended to make the decision final absent an
> appeal.

*Roberson*, 770 F.3d at 404, quoting *Peterson*, 714 F.3d at 914 (citations omitted).

*Peterson* observed that some of the Michigan factors overlapped with the *Elliott*

factors and were satisfied for the same reasons, such as the decision was

adjudicatory in nature and there was a right to appeal. The court also found that

there was mutuality of estoppel; that is, the parties to the misconduct hearing were

the same as the parties to the litigation.  Similarly, the court found that a question of fact essential to the judgment was actually litigated, since the charge was "submitted to the hearing officer for resolution, and it was resolved." *Id*.  And it found that, "by statute, this resolution was a valid and final one." *Id*.

Even if defendants have shown that the issue of fabrication of evidence and the failure to present exculpatory evidence was submitted and decided in the administrative proceeding and before Judge Giddings, defendants have not shown that plaintiff had a full and fair opportunity to litigate the issue.  In *Peterson*, the court concluded that "Peterson had incentive to vigorously contest" the officer's account, in part because Peterson risked 30 days' detention, and that he did so, calling witnesses, submitting affidavits, and moving to disqualify the hearing officer for bias.  *Id*. at 915-16.  As observed in *Roberson*, the court so concluded despite the fact that Peterson did not have access to counsel and was not allowed to view the videotape of the incident, where the hearing officer did review the tape, which was withheld for security reasons, and "the hearing officer gave Peterson a detailed description of what the video depicted, down to the time-stamped second of each relevant recorded activity." *Id*.  Because the Michigan courts' test was satisfied, the *Peterson* court accorded the hearing officer's factual determination preclusive effect.  *Roberson*, 770 F.3d at 404, citing *Peterson*, 714 F.3d at 916.

In contrast, just as in *Tucker*, defendants cannot establish that plaintiff had a full and fair opportunity to litigate the issue.  Plaintiff says that the video evidence and logbooks he requested were not collected because they were "confidential." The questions he wanted posed to Winters were not asked because she was on vacation.  Plaintiff's questions to witnesses were deemed "irrelevant" by the hearing officer.  The fingerprint evidence was not presented to the hearing office or Judge Giddings.[3]  The witness testimony that someone other than plaintiff attempted the escape was not presented to the hearing officer or Judge Giddings. While defendants now argue that none of that evidence would have directed a different result, the issue is whether plaintiff should be collaterally estopped because he had the opportunity to vigorously contest his claim that evidence was falsified and that exculpatory evidence was neither collected nor presented. Plainly, such evidence was not presented to the hearing officer and not presented to the circuit court.  Thus, *Peterson* does not provide a basis for rejecting plaintiff's substantive due process claim as barred by collateral estoppel because plaintiff was not, in fact, given the opportunity to vigorously contest the charges

---

[3]  Defendants' counsel stated at the hearing that they were not aware of the fingerprint evidence at the time of the hearing.  According to defendant Conachan's testimony, he does not recall being aware that fingerprints were taken in this case.  (Dkt. 94-4).  Whether defendants knew or did not know about the fingerprint evidence is not relevant to the issue of collateral estoppel.  That is, while such knowledge could be relevant if the Court were deciding if plaintiff established a genuine issue of material fact as to whether defendants presented false evidence or hid exculpatory evidence, this issue is not presently before the Court.

against him.

## IV.  RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that defendants' motion for summary judgment be **DENIED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).

The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: May 26, 2015                              s/Michael Hluchaniuk
                                                Michael Hluchaniuk
                                                United States Magistrate Judge

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 26, 2015, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

                                                s/Tammy Hallwood
                                                Case Manager
                                                (810) 341-7887
                                                tammy_hallwood@mied.uscourts.gov